We'll start with the first case, Suyono v. Sessions. Ms. Chen? Yes. Good morning, Your Honors. How are you? Thank you for giving me this chance this morning. The issues in this case is pretty straightforward. The first one is whether the BIA, the Board of Immigration Appeals, engaged in its own fact-finding when they did not give a reason that the immigration judge made a clearly erroneous in its own fact-finding when it reached an opposite decision from that of the immigration judge. And also the second one would be whether the Board of Immigration Appeals failed to engage any individualized analysis of the petitioner's situation in consideration of the changes situation in the country report, which would render little fear of the petitioner for return to the home country. First? The first issue is whether the BIA erred in going against the judgment of the IJ as to whether your client suffered past persecution. Yes, Your Honor. The BIA did not— Did you make an argument that the BIA didn't articulate reasons for that? Yes, Your Honor. You just made a conclusory statement that the BIA— Yes, Your Honor. He stated that the legal standard is a clear error, but he did not apply that legal standard. Essentially, the BIA adopted the argument on appeal that the petitioner did not testify credibly but without giving any explanation. And he went on to say that because assuming he testified arguably, he still did not meet his standard of past persecution. And at that point, again, he is involved in his independent fact-finding. His basis for his decision is the Indonesian government, for the first incident in 1992, the police did step in to stop it. But that's against the evidence, substantial evidence in the documents. Apparently, he said that the police intervened to stop the attack, but I think the IJ found that that was true, but that it was delayed. In other words, they didn't stop it right away, and it wasn't followed up by any arrests. Yeah, because the testimony is the police could have stepped in earlier to stop it, but he chose not to do that. But beyond that, there was no reason, because the evidence was right there. They were seeing the attack. The police were seeing the attack. They didn't have to do any further investigations. They could have made arrests, but they didn't make any arrests, apparently. Yes, Your Honor. And secondly, on the second incident in 1993, after the assault and injury, the petitioner's parents paid to have the police file a police complaint, while others in Indonesia, I think, did not need to pay money. And even if they paid money to file a police report, the government did not make any investigation. So the government took a bribe, in effect, to allow them to file a complaint, and then did nothing afterwards? Yes, Your Honor. And further, the immigration judge also stated that given the country report, although there's no conclusion of the practice of the persecution, but that's showing that the government was unwilling to protect those individuals from this persecution, while the board reached the opposite conclusion. And apparently, it's a fact finding. It has nothing to do with the legal conclusion. Okay. And based on these errors, I believe the petitioner is entitled to the— at least he's provided on his burden of proof that he had a well-founded fear of past persecution, which gives rise to the presumption of future fears of persecution. And on that point, the board also argued that the country changes so much that there's no well-founded fear, but the legal definition of a well-founded fear is both subjective and also objective, in that it has been a reasonable person if there's a slight chance of— even though how discernible it is might give rise to the reasonable person to perceive that possibility might occur. So I don't—the board failed to prove that burden, because the IG found the country condition in the Xindoleta changes so—changes, but it's not right to the point that substantially changed, that made the petitioner have no fear at all for return to the country, considering that he has the past persecution. And also the country report actually pointed to the other side. There is the institutionalized discrimination against the ethnic Chinese based on the ethnics and the religion, and also there's this— Should we separate that out in terms of thinking about, first of all, if you're not a Muslim or a Christian— I don't know which it is— is it—are you saying that there's discrimination against anybody who's not a Muslim? Or are you saying there's a discrimination particularly against Christians? Because, I mean, in Indonesia, the local Indonesian ethnics are Muslims, and the Chinese ethics are Christians, and it can be seen from the appearance that— So you're taking—I don't know if this is in the record. Are you saying that the Chinese in Indonesia are all Christians? Baptists or Christians, it's in the record. The Chinese ethics are different by appearance from the local Indonesian ethics, and all the Chinese are either Buddhist or Christian. Okay. Ms. Chin, you've reserved three minutes of rebuttal time, so we'll hear from the government, and then we'll hear your rebuttal argument. Thank you, Your Honor. May it please the Court, Your Honor. I'm Joanna Watson on behalf of Respondent, the United States Attorney General. And the standard of review here is the substantial evidence standard, which is whether the court would be compelled to reach a different conclusion. It's not whether— Does that mean it's a factual finding, then? We're talking about whether the mistreatment rose to the level of pest persecution is the first issue, isn't it? Correct. And is that judged by the substantial evidence standard? Yes. So does that make it a—does that mean it's a fact finding? It's fact with a legal conclusion. Well, I mean, I'm concerned about what is the standard of review by the board of the immigration judge's finding on that. The immigration judge said that the mistreatment did rise to the level of pest persecution. Correct, but the board in this particular case didn't fact find. The board based its decision on the same exact facts that the immigration did. How do we know what the board did? I mean, the immigration judge writes an opinion, and the board has exactly one sentence on this, which is, assuming the respondent's testimony is credible, we find the mistreatment does not rise to the level of pest persecution, period, full stop, end of analysis. How are we to evaluate why they said that or whether that makes sense or not? The board, in doing that, points to the analysis of the immigration judge that looked to the two incidents that happened, the 1992 incident where he was beaten and the 1993 incident, and the board also pointed to case law. There's one of the cases that it cited I believe is Joaquim Perez, and that was the case in which this court held that the rape of a homosexual individual by a police officer and then a subsequent detention by a police officer didn't rise to the level of persecution, and it also cited board president about what constitutes persecution. Okay, so how do we know that when someone is beaten twice on the grounds of his ethnicity or religion, and that's the thing we have to assume for purposes of this issue anyway, once beaten with a brick, once beaten with other instruments, as a matter of law, that's never enough to be pest persecution? I mean- You have to be beaten three times? It's all based on the circumstances of the cases and individual analysis. Okay, so what circumstances in this case make these two beatings not sufficient to constitute pest persecution according to the board? There are citations to Second Circuit case law. That's it. They didn't explain it. All they had to do to make the point was the cases have said that pest persecution requires X, Y, and Z, and this doesn't amount to that, and then we understand what they're doing, but they've given us this very cryptic conclusory statement that it doesn't rise to the level of pest persecution. That could be the judge getting up and not having his coffee that morning. It's not a rational explanation. I think you can derive from looking at the immigration- Do you think we should do that? Do you think that's really what our job is, to try and guess what the immigration board is thinking, rather than having a proper explanation? There should be a proper analysis, but when ultimately going to reach the same conclusion as the board, whether that rises to the level- Is the standard whether he's beaten three times, or does that have to be something bigger than a brick? What is the dividing line between beatings sufficient to be persecution and beatings insufficient? The court's held where somebody's been beaten and harassed is not persecution, but then there's Pan v. Holder, as I cited in my brief, where the person was beaten three times over three years, and the third beating, he was in the hospital for two weeks. That's more extreme than the situation here. It's an awful situation, clearly being beaten twice, but there weren't- But we agree that not every context in which a person is beaten in another country gives rise to a well-founded fear of persecution, based on the litany of characteristics in the convention, correct? Correct, and getting to the point, even if the court were to find past persecution here, DHS rebut the presumption that the board found here with a fundamental change in circumstances. We're looking at 18 years ago. Well, there wasn't a lot of analysis of that either. There's a citation to Exhibit 3A, which is the country conditions report. Correct. Where in the country conditions report does it say that conditions have fundamentally changed so that there is no problem? In the country conditions report, it says there are problems in some places, not problems in other places. Things are looking up a little bit. Is that enough to explain why country conditions have fundamentally changed? Well, I mean, at AR 209, it talks about the government respecting the six faiths, which included Catholicism, and petitioners are Christian. It also, at AR 221 and 252, it talks about the government officially promotes racial and ethnic tolerance, and that ethnic Chinese played a major role in the economy and increasingly participated in politics. In 2006, a citizenship law passed, and discrimination and harassment had declined. Once past persecution is assumed and you're in the position of rebutting the presumption, you do have to show the changed country conditions by a preponderance, right? Yes. Can I ask, because there's no analysis in the BIA's opinion. It is pretty brief. But we recognize in PAN that there is a need for consistency in these applications, and we do have some reorders in this circuit that have addressed the situation of Chinese Christian applicants from Indonesia. And in some of those cases, there has been mistreatment of the individual involved, assertions that he was physically assaulted by a group of Muslim men at his church and the like, and we have said that that does not constitute, does not rise to the level of past persecution. But the BIA doesn't analyze that case law. It just gives us one general citation to a case not involving Chinese Christian applicants from Indonesia. Don't we need a little bit of an explanation to say that it's looked at this past case law and making its determination? It's ideal when the board does do more of an analysis here, but I think based on citing the case law that discusses what rises to the level of persecution, as well as while it's not a Chinese Christian case that the board cited, but, you know, that rape by a police officer and then a later detention doesn't rise to the level of persecution, I think you can derive enough to make a determination whether it rose to the level. The dissenting board member says that this issue was waived, that the department did not challenge before the BIA the finding that the petitioner here, respondent there, had experienced past persecution. Is that wrong? Well, that was essentially waived by petitioner because it was never, the past persecution claim was fully briefed before the court, so essentially it's a waiver of waiver. So they waived the waiver issue by not raising it in this court? Is that correct? But the board, the majority, I mean, that's a dissenting opinion. The majority, I mean, the board held that they addressed the past persecution claim. They did. I'm trying to find out whether it is correct or incorrect what the dissenting member said, that the department did not challenge before the board the past persecution finding. I believe they did. I mean, the primary challenge was credibility. Well, often there are primary and secondary challenges. The question is, was this even a secondary challenge? The dissenting member says it was not raised by the department. And I'm just asking you, is that correct in the record? I believe it is correct, but it's a waiver of waiver argument because everything's been fully addressed by the board and now briefed before the court now. But if it wasn't raised, then the only issue that was properly joined was whether or not there were changed country conditions. There was an assumption of past persecution. If the DHS said that, then there was an assumption of past persecution, notwithstanding all of the arguments that the BIA made later. And then the only issue was whether the country conditions had changed to rebut it. And that's what the dissent says. And I'm just wondering if you fault what the dissent says. You have the dissent in front of you. Do I fault? Is there anything inaccurate about what the dissent said? Well, their finding wasn't credible. And then, well, they're saying even if it had been perceived, yeah, the alternative finding, I guess they didn't get to the rise to the level of persecution when they filed the appeal. They focused on the credibility and rebutting the presumption. So in summation, I ask the court to uphold the board's determination that substantial evidence supports the board's determination that Petitioner did not suffer past persecution and alternatively that conditions almost 20 years later had sufficiently changed to rebut the presumption of future persecution. Thank you, Your Honors. Mm-hmm. Your Honors, just as the government just admitted that they waived the issue whether the Petitioner has proved that he has suffered past persecution. So if the government already waived that argument in the underlying proceeding, there's no way we can revive that by accepting it. The only reason Petitioner raised that issue just for purpose of safeguard and that will take care of that issue of past persecution. As to the change of country conditions, in that regard, I think the BIA also engaged in fact-finding, which is contrary to the IJ's decision. The IJ did take into consideration of the change of country condition, but he said that there's no evidence of significant change in the country condition that would render the respondent little fear of persecution upon return to Indonesia so that they'll be still maintained aware from the fear. Just to make sure I understand the record, your client applied for asylum in the 1990s. In 1999, he was turned down, and he applied again in 2004 and was again turned down. So this is his third application, but each time he gave the same testimony about the beatings and the mistreatment he endured in Indonesia, and the IJ found him credible on each occasion, correct? I believe he testified to the same facts, but I'm not sure about the credibility. No, he did not go through the IJ for the prior two stint. He only went to the immigration officer. The first two times, am I right about this? He was not before an IJ because he was not in removal proceedings. These were affirmative applications. Yes, I understand. But his narrative about what happened to him was the same each time. Yes. And lastly, your Honor, I just want to remind the government that it's been 18 years passed by, but we cannot look at those things from our standpoint. We have to take a look at things when that happened at that time when the petitioner filed his petition, and it's 2008 when it's based on the 2008 country report, and also at that time the petitioner also submitted two recent news articles with reporting the most recent riots in that country. So at that time, he did have the reasonable objective fear of returning to the country. Thank you, Your Honor. Thank you both. We'll take it under submission.